**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**BLUEFIELD DIVISION**

**BRAD MATTHEW PETTREY,**

      **Plaintiff,**

**v.**                                                    **Case No.: 1:17-cv-03340**

**NANCY A. BERRYHILL,
Acting Commissioner of
Social Security,**

      **Defendant.**

## PROPOSED FINDINGS AND RECOMMENDATIONS

This action seeks a review of the decision of the Commissioner of the Social Security Administration (hereinafter "Commissioner") denying Plaintiff's applications for a period of disability and disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401-433, 1381-1383f. The matter is assigned to the Honorable David A. Faber, United States District Judge, and was referred to the undersigned United States Magistrate Judge by standing order for submission of proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). Presently pending before the Court are Plaintiff's brief requesting judgment on the pleadings and the Commissioner's brief in support of her decision, requesting judgment in her favor. (ECF Nos. 10, 13).

The undersigned has fully considered the evidence and the arguments of counsel. For the following reasons, the undersigned **RECOMMENDS** that Plaintiff's

request for judgment on the pleadings be **DENIED**; the Commissioner's request for judgment on the pleadings be **GRANTED;** the Commissioner's decision be **AFFIRMED**; and this case be **DISMISSED** and removed from the docket of the Court.

## I.    Procedural History

On September 25, 2013 and November 1, 2013, Plaintiff Brad Matthew Pettrey ("Claimant"), completed applications for DIB and SSI, alleging a disability onset date of September 11, 2013 and September 12, 2013, respectively, due to Addison's disease,[1] diabetes; thyroid malfunction; asthma; allergies; sleep apnea; and physical,  mental, and emotional impairments from treatment of Addison's disease. (Tr. at 293-301, 334). The Social Security Administration ("SSA") denied Claimant's applications initially and upon reconsideration. (Tr. at 207-16, 218-31). Claimant then filed a request for an administrative hearing, which was held on January 27, 2016, before the Honorable Michael D. Shilling, Administrative Law Judge ("ALJ"). (Tr. at 51-76). By written decision dated February 11, 2016, the ALJ found that Claimant was not disabled as defined by the Social Security Act. (Tr. at 24-50). The ALJ's decision became the final decision of the Commissioner on April 25, 2017 when the Appeals Council denied Claimant's request for review. (Tr. 3-9).

Claimant timely filed the present civil action seeking judicial review pursuant to 42 U.S.C. § 405(g). (ECF No. 2). The Commissioner subsequently filed an Answer opposing Claimant's complaint, and a Transcript of the Administrative Proceedings.

---

[1] Addison's Disease is the common term for primary adrenal insufficiency. *See* National Institute of Diabetes and Digestive and Kidney Disease, National Institutes of Health, U.S. Department of Health and Human Services at https://www.niddk.nih.gov/health-information/endocrine-disease/adrenal-insuficiency-addisons-disease.

(ECF Nos. 8,  9). Claimant filed a Brief in Support of Judgment on the Pleadings and the Commissioner filed a Brief in Support of Defendant's Decision. (ECF Nos. 10, 13). Consequently, the matter is fully briefed and ready for resolution.

## II.    **Claimant's Background**

Claimant was 32 years old on his alleged onset date and 35 years old on the date of the ALJ's decision. (Tr. at 39, 55). He has a college degree in information technology and communicates in English. (Tr. at 56, 333). Claimant previously worked as a pharmacy technician, stock clerk, and store manager. (Tr. at 416).

## III.    **Summary of ALJ's Decision**

Under 42 U.S.C. § 423(d)(5), a claimant seeking disability benefits has the burden of proving a disability. *See Blalock v. Richardson,* 483 F.2d 773, 775 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

The Social Security regulations establish a five step sequential evaluation process for the adjudication of disability claims. If an individual is found "not disabled" at any step of the process, further inquiry is unnecessary and benefits are denied. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). The first step in the sequence is determining whether a claimant is currently engaged in substantial gainful employment. *Id.* §§ 404.1520(b), 416.920(b). If the claimant is not, then the second step requires a determination of whether the claimant suffers from a severe impairment. *Id.* §§ 404.1520(c), 416.920(c). A severe impairment is one that "significantly limits [a claimant's] physical or mental ability to do basic work activities." *Id.* If severe

3

impairment is present, the third inquiry is whether this impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4 (the "Listing"). *Id.* §§ 404.1520(d), 416.920(d). If so, then the claimant is found disabled and awarded benefits.

However, if the impairment does not meet or equal a listed impairment, the adjudicator must assess the claimant's residual functional capacity ("RFC"), which is the measure of the claimant's ability to engage in substantial gainful activity despite the limitations of his or her impairments. *Id.* §§ 404.1520(e), 416.920(e). After making this determination, the fourth step is to ascertain whether the claimant's impairments prevent the performance of past relevant work. *Id.* §§ 404.1520(f), 416.920(f). If the impairments do prevent the performance of past relevant work, then the claimant has established a *prima facie* case of disability, and the burden shifts to the Commissioner to demonstrate, in the fifth and final step of the process, that the claimant is able to perform other forms of substantial gainful activity, given the claimant's remaining physical and mental capacities, age, education, and prior work experiences. 20 C.F.R. §§ 404.1520(g), 416.920(g); *see also McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983). The Commissioner must establish two things: (1) that the claimant, considering his or her age, education, skills, work experience, and physical shortcomings has the capacity to perform an alternative job, and (2) that this specific job exists in significant numbers in the national economy. *McLamore v. Weinberger*, 538 F.2d 572, 574 (4th Cir. 1976).

Here, the ALJ determined as a preliminary matter that Claimant met the insured status for disability insurance benefits through September 30, 2018. (Tr. at 29, Finding No. 1). At the first step of the sequential evaluation, the ALJ confirmed that

Claimant had not engaged in substantial gainful activity since September 12, 2013, the alleged disability onset date. (*Id.*, Finding No. 2). At the second step of the evaluation, the ALJ found that Claimant had the following severe impairments: "Addison's disease, obesity, asthma, diabetes mellitus, neuropathy, anxiety, depression, and venous insufficiency." (*Id.*, Finding No. 3). The ALJ considered Claimant's other alleged impairments of hypertension, hypercholesterolemia, sleep apnea, osteopenia, gastroesophageal reflux disease, celiac disease, and hypothyroidism, but found them to be non-severe impairments. (Tr. at 29-30, Finding No. 3).

Under the third inquiry, the ALJ concluded that Claimant did not have an impairment or combination of impairments that met or medically equaled any of the impairments contained in the Listing. (Tr. at 31-32, Finding No. 4). Accordingly, he determined that Claimant possessed:

> [T]he residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) in that he could lift and carry 10 pounds occasionally and 10 pounds frequently. He could walk or stand 30 minutes at a time, for a total of 2 hours out of an 8-hour workday. He could sit for 30 minutes at a time, for a total of 6 hours out of an 8-hour workday. He could frequently climb stairs, but never climb ladders, ropes, and scaffolds. He could occasionally stoop, crouch, kneel, balance, or crawl. He should avoid prolonged exposure to chemicals, dust, fumes, noxious odors, and humidity. He requires the use of a cane at times, but could carry 10 pounds in the free hand. He is limited to simple work. He is also limited to occasional interaction with coworkers and the general public. However, he retains the ability to accept supervision on a basic level.

(Tr. at 33-39, Finding No. 5). At the fourth step, the ALJ determined that Claimant was unable to perform any past relevant work. (Tr. at 39, Finding No. 6). Under the fifth and final inquiry, the ALJ reviewed Claimant's past work experience, age, and education in combination with his RFC to determine his ability to engage in substantial gainful activity. (Tr. at 39-41, Finding Nos. 7-10). The ALJ considered that (1) Claimant

was born in 1980 and was defined as a younger individual age 18-44; (2) he had at least a high school education and could communicate in English; and (3) transferability of job skills was not an issue because the Medical-Vocational Rules supported a finding that Claimant was "not disabled," regardless of his transferable job skills. (Tr. at 39-40, Finding Nos. 7-9). Taking into account these factors, Claimant's RFC, and the testimony of a vocational expert, the ALJ determined that Claimant could perform jobs that existed in significant numbers in the national economy, including sedentary unskilled work as a document preparer, eye glass polisher, and wire patcher. (Tr. at 40). Consequently, the ALJ concluded that Claimant was not disabled as defined in the Social Security Act and was not entitled to benefits. (Tr. 41, Finding No. 11).

## IV.    **Claimant's Challenges to the Commissioner's Decision**

Claimant challenges the Commissioner's decision on the basis that "the ALJ failed to provide an adequate explanation for his RFC finding, resulting in his decision being unsupported by substantial evidence." (ECF No. 10 at 5). Specifically, Claimant contends that "the ALJ failed to clarify the frequency of [Claimant's] need to alternate sitting and standing or the length of time [that Claimant] would need to stand before returning to a seated position as required by the Agency's rules and regulations." (*Id.*) (citing C.F.R. §§ 404.1545(a)(1), 416.945(a)(1) and SSR 96-9p). Furthermore, Claimant asserts that the vocational expert's testimony that Claimant's need to alternate sitting and standing would not erode the unskilled, sedentary occupational base was in direct conflict with SSR 83-12 and 96-9p, and the ALJ failed to resolve such inconsistency. (*Id.* at 7).

In response to Claimant's challenges, the Commissioner contends that the ALJ's sitting and standing limitations did not lack specificity, and the ALJ correctly relied on

the vocational expert's testimony that the need to alternate between sitting and standing would not preclude Claimant from performing a significant number of sedentary jobs. (ECF No. 13 at 8-9).

## V.    **Relevant Evidence**

The undersigned has reviewed all of the evidence before the Court and the information that is most pertinent to Claimant's challenge is summarized as follows:

### A. *Claimant's Testimony*

Claimant testified at the January 27, 2016 administrative hearing that he was 35 years old, 5 feet and 7 inches tall, and weighed 227 pounds. (Tr. at 55-56). He had a college degree in information technology and lived with his seven-year-old daughter and parents. (Tr. at 56). As to his impairments, Claimant testified that he had neuropathy that felt like a burning sensation in the bottoms of his feet halfway up to his knees, which made it difficult to walk, stand, or sit for long periods of time. (Tr. at 57-58). Claimant stated that he used a cane any time that he left his home and also used it approximately twice per week at home to take pressure off of his left foot because pressure made his neuropathy worse. (Tr. at 58). Claimant testified that when he did not use the cane, he walked with a limp and tried to hold on to furniture to walk through the house. (*Id.*). He also had swelling in his legs every day, which was made worse by walking and better with elevation. (Tr. at 59). He typically elevated his legs three times per day for a total of three and one-half to four hours per day. (*Id.*). He was on an insulin pump for diabetes mellitus and his blood glucose was improving, but still fluctuated. (Tr. at 61). Claimant also had Addison's disease, which required him to take cortisone to boost his immune system. (*Id.*).

Claimant stated that his parents helped him care for his daughter as he could

not physically take care of her by himself. (Tr. at 65). He did a "little bit" of laundry, made simple meals, and sometimes accompanied his daughter in the car to school, but did not drive her. (Tr. at 65-66, 68). He shopped for groceries once per week and used a motorized cart or leaned against the shopping cart to keep pressure off his feet and maintain balance. (Tr. at 66-67). He could play the guitar, but only for 30 minutes at a time due to swelling in his hands. (Tr. at 67). He also went to the park with his daughter and could sit on a bench for approximately 30 minutes, went out to eat occasionally, and used a computer for 30 minutes at a time. (Tr. at 68-69). Claimant further stated that he went to his daughter's school performances and would try to stand up between songs to relieve pressure from the venous insufficiency in his legs. (Tr. at 70).

### B. Treatment Records

Claimant had an x-ray on January 31, 2013, which showed osteopenia of the spine. (Tr. at 530). Claimant's physical therapist believed that it was caused by his high dose of steroids for Addison's disease. (Tr. at 446). Later that year, on April 1, 2013, Claimant saw Mark Clarkson, D.O., for a "regular diabetic check up." Claimant was concerned that his Addison's disease and diabetes were out of control. (Tr. at 511). He complained of hot flashes and intermitted numbness below his knees. (*Id.*). Testing was ordered regarding his hypothyroidism, diabetes mellitus, and Addison's disease. (Tr. at 516).

On April 16, 2013, Claimant was referred to endocrinologist, Samar Sankari, M.D., regarding his diabetes mellitus. On examination, Claimant had +1 edema and decreased sensations and reflexes. (Tr. at 539). Claimant was noted to be a good candidate for an insulin pump. (*Id.*). However, until then, he was to continue medications and check his blood glucose more frequently. (*Id.*).

8

On September 5, 2013, Claimant presented to Princeton Community Hospital stating that he was feeling dizzy and weak. (Tr. at 459). His serum cortisol level was less than "0.4."[2] (*Id.*). Therefore, Claimant was given intravenous hydrocortisone and Florinef and stated that he felt somewhat better. (*Id.*).

On September 27, 2013, Claimant presented as a new patient to family care physician, Donet Glasscock, D.O., complaining of dizziness and fatigue. (Tr. at 616). His sensation was intact, but he had +1 edema in his ankles, feet, and hands. (*Id.*). Claimant saw his endocrinologist, Dr. Sankari, shortly thereafter on November 12, 2013. Claimant was on Lasix and had no edema. (Tr. at 918). However, his blood glucose was not at target. He was to be trained on the use of an insulin pump. (*Id.*). His Addison's disease was noted to be "stable, but overtreated." (*Id.*).

On December 5, 2013, Claimant saw neurologist, Tahir Rana, M.D., for evaluation of tingling and burning in his feet and occasional numbness up to his knees. (Tr. at 645). Claimant's sensory examination was normal. (Tr. at 646). Dr. Rana ordered several tests, including a nerve conduction study and blood tests. (*Id.*). Claimant followed up with Dr. Rana the following month on January 16, 2014. Claimant's nerve conduction study was still pending approval. (Tr. at 650). His cortical sensations were noted to be normal. (Tr. at 652). Dr. Rana diagnosed Claimant with chronic back pain that was probably musculoligamentous in origin and possible diabetic neuropathy with paresthesia. (Tr. at 653).

Claimant saw Dr. Glasscock on March 5, 2014. Claimant had trace edema and

---

[2] Cortisol levels are generally highest early in the morning and a normal range is typically 10 to 20 mcg/dL from 6:00 a.m. to 8:00 a.m. and 3 to 10 mcg/dL around 4:00 p.m. https://www.urmc.rochester.edu/encyclopedia/content.aspx?contenttypeid=167&contentid=cortisol_serum.

pain to light touch in his extremities. (Tr. at 762). His diagnoses were low back and thoracic pain, diabetes mellitus, peripheral neuropathy, and Addison's disease. (*Id.*). He was prescribed Levaquin and Neurontin and x-rays were ordered of his lumbar and thoracic spine. (*Id.*). The x-rays, taken on March 6, 2014, showed no lumbar or thoracic fractures. (Tr. at 741, 743).

On April 2, 2014, Claimant saw a podiatrist, Tim Donatelli, D.P.M., for diabetic foot care. (Tr. at 1015). Claimant reported foot pain, swelling, and decreased sensation. (*Id.*). Dr. Donatelli diagnosed Claimant with metatarsalgia, tendonitis, and diabetes mellitus with neurological manifestation. (Tr. at 1016).

On July 9, 2014, Claimant saw Miguel A. Montejo, M.D., for evaluation of low back and shoulder pain. (Tr. at 801). Claimant was taking Ultram, Neurontin, and Flector. (*Id.*). Claimant had a slow, unsteady, limping gait, and he walked with difficulty although using a cane. (Tr. at 803). He was started on Hydrocodone for pain. (*Id.*).

On October 30, 2014, Claimant saw neurologist, Bandhu Paudyal, M.D., for numbness and tingling of his hands and feet. (Tr. at 1044). Claimant had normal sensation on examination. (Tr. at 1048). Dr. Paudyal believed that Claimant likely had diabetic neuropathy and planned to perform nerve conduction studies to confirm that suspicion. (*Id.*). Claimant followed-up with Dr. Montejo on November 25, 2014. Claimant complained of low back pain radiating into his hips, legs, and feet. (Tr. at 842). He was noted to be stable, however, and his hydrocodone was refilled. (*Id.*).

On December 3, 2014, Claimant again saw Dr. Paudyal. Claimant's sensory examination showed reduced pin sensation up to Claimant's mid-thigh and bilateral mid forearm. (Tr. at 1053). His nerve conduction study did not show any evidence of

peripheral neuropathy, but could not rule out small fiber neuropathy. (Tr. at 1054). Dr. Paudyal ordered MRIs of Claimant's brain and cervical spine and referred Claimant for a skin biopsy to evaluate whether Claimant had small fiber neuropathy. (*Id.*).

On December 5, 2014, Claimant saw Dr. Glasscock. Claimant had no new complaints and his Neurontin was decreased (Tr. at 833). Thereafter, on March 2, 2015, Claimant saw pulmonologist, Vishnu Patel, M.D., for occasional shortness of breath. (Tr. at 864). Claimant was noted to be a chronic smoker and was taking medications including an albuterol nebulizer treatment, Atrovent, Combivent, Symbicort, and Zithromax. (*Id.*). Dr. Patel diagnosed Claimant with asthma and dyspnea on exertion. (Tr. at 863). He was continued on his current medications. (*Id.*).

On May 19, 2015, Claimant saw family practice physician, Amanda Bailey, D.O., at Mercer Medical Group. Claimant complained of swelling, bruising, hair loss, pain, numbness, tingling, and discoloration in his legs. (Tr. at 976). Dr. Bailey suspected that Claimant had peripheral artery disease with decreased circulation and advised Claimant that there were medications he could try for such condition. (*Id.*). Dr. Bailey also noted that Claimant was taking Alendronate weekly for his bones. (*Id.*). His annual bone density scan showed that his osteopenia had not progressed to osteoporosis. (Tr. at 978).

On June 4, 2015, Claimant saw Dr. Paudyal. Claimant complained of worsening numbness and tingling in his feet and hands. (Tr. at 1060). He had reduced pin sensation up to his mid-thighs and mid-forearms and an antalgic gait due to left leg pain. (*Id.*). His MRIs were normal and his skin biopsy was inconclusive. (*Id.*). Dr. Paudyal ordered more testing, referred Claimant to a podiatrist, and continued Claimant on neuropathic pain medicine, as well as Lamictal and Cymbalta. (Tr. at

1061).

On June 19, 2015, Claimant saw Dr. Chianese for foot pain that was worse on the left and burning in his lower legs and feet. (Tr. at 1013). Claimant was diagnosed with diabetes mellitus with neurological manifestation, neuritis, and metarsalgia. (Tr. at 1014). He was prescribed orthotic shoes and Neurontin. (*Id.*). At his next visit with Dr. Chianese on July 17, 2015, Claimant reported that Neurontin "was helping" and his foot pain was decreasing. (Tr. at 1011). However, on examination, Claimant still had bilateral sensory paresthesia in his distal extremities in a "stocking glove" pattern. (Tr. at 1012). His Neurontin was increased. (*Id.*).

On August 26, 2015, Claimant advised Dr. Donatelli that the numbness in his extremities was improving. (Tr. at 1009). Thus, he was continued on Neurontin. (Tr. at 1010). The next day, Claimant saw vascular surgeon, Joseph G. Protain, D.O., for "a three plus month history of bilateral leg pain, swelling, restless leg syndrome, difficulty walking, edema pitting +2, moderate discoloration and mild dermatitis." (Tr. at 1125). Dr. Protain recommended laser ablation for bilateral venous insufficiency. (Tr. at 1127). Claimant had laser ablation of his left above knee greater saphenous vein on September 24, 2015. (Tr. at 1132). At his follow-up visit on October 15, 2015, Claimant reported a fifty percent improvement in his left lower leg pain and swelling. (Tr. at 1135). Thus, on October 29, 2015, Claimant had the same laser ablation procedure on his right leg. (Tr. at 1139).

At Claimant's next appointment with Dr. Protain on November 12, 2015, Claimant reported some continued leg tenderness, but improvement in swelling. (Tr. at 1144). On examination, he had no edema, erythema, or signs of infection, but had some dry scaly skin and hemosiderin and ecchymosis at the catheter entry site in

Claimant's right leg. (*Id.*). Claimant was to continue his conservative measures of treatment such as leg elevation and compression stockings, could increase his activities as tolerated, and if his symptoms persisted, further laser ablation or other treatment could be considered. (*Id.*).

On December 3, 2015, Claimant saw Dr. Paudyal for a neuropathy follow-up appointment. (Tr. at 1192). Claimant's symptoms were improving on Neurontin. He had normal sensation, but had mild swelling in his feet. (Tr. at 1196). His sensory examination was normal. (*Id.*). On the same day, Claimant had laser ablation of the left greater saphenous vein below the knee. (Tr. at 1146). Thereafter, on December 17, 2015, Claimant had laser ablation of his greater saphenous vein below the knee. (Tr. at 1215).

At a follow-up appointment on January 7, 2016, Claimant reported a thirty percent improvement in his lower leg pain and swelling after his laser ablation procedures and voiced no new complaints. (Tr. at 1220). He had only trace edema in his lower legs, his skin was "in good repair," and his ultrasound examination showed that the ablation was successful. (*Id.*). Claimant was advised to continue wearing compression stockings as needed and resume activities as tolerated. (*Id.*).

On May 31, 2016, Claimant saw Dr. Paudyal. The tingling and numbness in his hands and feet associated with his occasional low back pain were better and moderately relieved by Neurontin. (Tr. at 1309). Claimant was continued on Neurontin for his diabetic neuropathy. (*Id.*).

### *C. Evaluations and Opinions*

On December 16, 2013, agency physician, Caroline Williams, M.D., assessed Claimant's RFC based upon a review of his records. Dr. Williams found that Claimant's severe impairments included an adrenal gland disorder, COPD, and diabetes mellitus

and his non-severe impairments included asthma, hyperlipidemia, essential hypertension, and obesity. (Tr. at 143-44). Dr. Williams opined that Claimant could perform work at the medium exertional level; stand/walk or sit for six hours; never climb ladders/ropes/scaffolds; occasionally balance; and perform other postural activities frequently. (Tr. at 146). Dr. Williams also assessed several environmental limitations. (Tr. at 147). Subhash Gajendragadkar, M.D., affirmed Dr. Williams' assessment at the reconsideration level of review on May 16, 2014. (Tr. at 180-82).

### D. Vocational Expert Testimony

Vocational expert, Janice Hastert (the "VE"), testified at Claimant's administrative hearing. The ALJ presented the vocational expert with the following hypothetical individual:

> [A]ssume we have an individual the same age, educational background as the claimant with the same work history. Assume this individual would retain the capacity to occasionally lift ten pounds, frequently ten pounds, walk or stand two hours out of an eight-hour day for 30 minutes at a time, sit for six hours out of an eight-hour day for 30 minutes at a time. Can frequently climb stairs and should never climb ropes, scaffolds, or ladders; could occasionally balance, stoop, crouch, kneel, and crawl. He should avoid prolonged exposure to chemicals, dust, fumes, obnoxious odors, and humidity. He should avoid unprotected heights, and hazardous machinery. He would be limited to simple work with occasional interaction with coworkers, and occasional interaction with the general public. For these purposes, assume he retains the ability to accept supervision on a basic level.

(Tr. at 71-72). When asked if the hypothetical individual could perform Claimant's past relevant work, the VE responded that such a person could not do so, but could perform other jobs available in significant numbers in the national economy. The VE stated that "[g]ood examples in the sedentary unskilled category that would meet that criteria would be a document preparer ... eyeglass polisher ... [and] a wire patcher." (Tr. at 72).

14

The ALJ added to the hypothetical scenario that the individual would "require a cane in one hand and could carry up to ten pounds in the other hand." (Tr. at 73). The VE stated that the additional limitation would not significantly impact the sedentary occupational base. (*Id.*).

Claimant's attorney also questioned the VE regarding the sit/stand option, as set forth in the following exchange:

> Q. In the judge's hypothetical with the sitting for – or well the ability to sit for six of eight hours 30 minutes at one time, would that affect the number of jobs available or anything in terms of –
>
> A. No, sir. As the sedentary work is performed, it's how it's generally performed.
>
> Q. So –
>
> A. So, the numbers I have given you are as what's general performed.
>
> Q. Is there – there's an ability – there's the ability to have a sit/stand option in the workplace in those sedentary jobs that you listed?
>
> A. Routinely in these jobs it's not uncommon for a person to be able to stand up and stretch for a few minutes then sit back down and continue to perform those duties. So, no, there is not a – if I were to adjust the base it wouldn't be as the work is generally performed. I'm required to testify as work is generally performed not as a modification or a change or an adaption to it. So, as this work is generally performed there is some flexibility position changing in the performance of sedentary work as defined by the DOT.

(Tr. at 73-74). Claimant's attorney then stated that he "would place a general objection given SSR 83-12 says that sedentary work does not contain the ability for a sit/stand option." (Tr. at 74).

**VI.  Standard of Review**

The issue before the Court is whether the final decision of the Commissioner is based upon an appropriate application of the law and is supported by substantial evidence. *See Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). In *Blalock v.*

*Richardson*, the Fourth Circuit Court of Appeals defined "substantial evidence" to be:

> [E]vidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

*Blalock*, 483 F.2d at 776 (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966)). This Court is not charged with conducting a *de novo* review of the evidence. Instead, the Court's function is to scrutinize the record and determine whether it is adequate to support the conclusion of the Commissioner. *Hays*, 907 F.2d at 1456. When conducting this review, the Court does not re-weigh evidence, make credibility determinations, or substitute its judgment for that of the Commissioner. *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 2001) (citing *Hays*, 907 F.2d at 1456)). Moreover, "[t]he fact that the record as a whole might support an inconsistent conclusion is immaterial, for the language of § 205(g) ... requires that the court uphold the [Commissioner's] decision even should the court disagree with such decision as long as it is supported by 'substantial evidence.'" *Blalock*, 483 F.2d at 775 (citations omitted). Thus, the relevant question for the Court is "not whether the claimant is disabled, but whether the ALJ's finding of no disability is supported by substantial evidence." *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (citing *Craig*, 76 F.3d at 589).

## VII.   <u>Discussion</u>

Claimant challenges the Commissioner's decision on the basis that "the ALJ failed to provide an adequate explanation for his RFC finding, resulting in his decision being unsupported by substantial evidence." (ECF No. 10 at 5). Claimant states that "the ALJ failed to clarify the frequency of [Claimant's] need to alternate sitting and

standing or the length of time [that Claimant] would need to stand before returning to a seated position as required by the Agency's rules and regulations." (*Id.*) (citing 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1) and SSR 96-9p). Furthermore, Claimant asserts that the vocational expert's testimony that Claimant's need to alternate sitting and standing would not erode the unskilled, sedentary occupational base was in direct conflict with SSR 83-12 and SSR 96-9p and the ALJ failed to resolve such inconsistency. (*Id.* at 7).

Social Security Ruling ("SSR") 96-8p provides guidance on how to properly assess a claimant's RFC, which is the claimant's "ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis." SSR 96-8p, 1996 WL 374184, at *1. RFC is a measurement of the ***most*** that a claimant can do despite his or her limitations resulting from both severe and non-severe impairments, and the finding is used at steps four and five of the sequential evaluation to determine whether a claimant can still do past relevant work and, if not, whether there is other work that the claimant is capable of performing. *Id.* According to the Ruling, the ALJ's RFC determination requires "a function-by-function assessment based upon all of the relevant evidence of an individual's ability to do work-related activities." *Id.* at *3. The functions that the ALJ should assess include the claimant's physical abilities, "such as sitting, standing, walking, lifting, carrying, pushing, pulling, or other physical functions (including manipulative or postural functions, such as reaching, handling, stooping or crouching);" mental abilities; and other abilities, "such as skin impairment(s), epilepsy, impairment(s) of vision, hearing or other senses, and impairment(s) which impose environmental restrictions." 20 CFR §§ 404.1545(b-d), 416.945(b-d).

Only by examining specific functional abilities can the ALJ determine (1) whether a claimant can perform past relevant work as it was actually, or is generally, performed; (2) what exertional level is appropriate for the claimant; and (3) whether the claimant "is capable of doing the full range of work contemplated by the exertional level." SSR 96-8p, 1996 WL 374184, at *3. Indeed, "[w]ithout a careful consideration of an individual's functional capacities to support an RFC assessment based on an exertional category, the adjudicator may either overlook limitations or restrictions that would narrow the ranges and types of work an individual may be able to do, or find that the individual has limitations or restrictions that he or she does not actually have." *Id.* at *4.

In determining a claimant's RFC, the ALJ "must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g. laboratory findings) and nonmedical evidence (e.g., daily activities, observations)." *Id.* at *7. Further, the ALJ must "explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved." *Id.* at *7. "Remand may be appropriate where an ALJ fails to assess a claimant's capacity to perform relevant functions, despite contradictory evidence in the record, or where other inadequacies in the ALJ's analysis frustrate meaningful review." *Mascio*, 780 F.3d at 636 (quoting *Cichocki v. Astrue*, 729 F.3d 172, 177 (2d Cir. 2013)) (markings omitted).

In this case, the ALJ found that Claimant had the RFC to perform a limited range of sedentary work, including the ability to "walk or stand 30 minutes at a time, for a total of 2 hours out of an 8-hour workday," "sit for 30 minutes at a time, for a total of 6 hours out of an 8-hour workday," and perform "simple work." (Tr. at 33). Social

Security Ruling SSR 96-9p explains that the occupational base for a full range of unskilled sedentary work is eroded when an individual's need to alternate between standing and sitting cannot be accommodated by scheduled breaks and a lunch period. SSR 96-9p, 1996 WL 374185, at *7. The ruling explains that the "extent of the erosion will depend on the facts in the case record, such as the frequency of the need to alternate sitting and standing and the length of time needed to stand." *Id.* Therefore, the "RFC assessment must be specific as to the frequency of the individual's need to alternate sitting and standing" and it "may be especially useful in these situations to consult a vocational resource in order to determine whether the individual is able to make an adjustment to other work." *Id.*

Furthermore, Social Security Ruling 83-12 explains that in "some disability claims, the medical facts lead to an assessment of RFC which is compatible with the performance of either sedentary or light work except that the person must alternate periods of sitting and standing." SSR 83-12, 1983 WL 31253, at *4. "Such an individual is not functionally capable of doing … the prolonged sitting contemplated in the definition of sedentary work." *Id.* Acknowledging that "most jobs have ongoing work processes which demand that a worker be in a certain place or posture for at least a certain length of time to accomplish a certain task" and that "[u]nskilled types of jobs are particularly structured so that a person cannot ordinarily sit or stand at will," the ruling states that "[i]n cases of unusual limitation of ability to sit or stand," a vocational expert "should be consulted to clarify the implications for the occupational base." *Id.*

Here, Claimant challenges only the ALJ's RFC assessment regarding his ability to sit and stand. Relating to such functional abilities, the ALJ discussed Claimant's obesity, Addison's disease, diabetes mellitus, numbness below his knees, use of a cane

outside of the home, venous insufficiency in his lower extremities, mild edema at times, and mild breathing restriction. (Tr. at 33-35). The ALJ also considered Claimant's daily activities, including that Claimant used the computer and sat at the park with his daughter for 30 minutes at a time; went grocery shopping weekly by leaning on the grocery cart; cooked simple meals; played the guitar; occasionally went out to eat; and attended his daughter's school concerts, but occasionally stood between songs. (Tr. at 35). The ALJ found that such facts suggested that Claimant could sit for at least 30 minutes at a time. (*Id.*). The ALJ further evaluated and weighed the opinion and gave no weight to the state agency physicians' findings that Claimant could perform a reduced range of medium work, noting that evidence received after their assessments showed diminished lower extremity sensation and venous insufficiency, which showed greater limitation than the experts found. (Tr. at 36).

As to the ALJ's failure to specify the frequency of Claimant's need to alternate between sitting and standing, numerous district courts within the United States Court of Appeals for the Fourth Circuit have considered this precise issue, particularly in light of SSR 96-9p's guidance that an ALJ must specify the "frequency of the individual's need to alternate sitting and standing." However, courts have concluded that the reasonable implication of an ALJ's silence regarding the frequency of a claimant's need to alternate between sitting and standing is that the sit/stand option is "at will" and no greater specificity is required so long as an ALJ's hypothetical to the vocational expert and RFC is not inconsistent with an at will sit/stand option. *Polly v. Comm'r of Soc. Sec.*, No. 2:13-CV-85, 2014 WL 2808626, at *8, 12 (N.D.W. Va. June 20, 2014) (The ALJ's hypothetical stated that the "person would need a sit/stand option at will as long as she were not more than 15 percent off task" was sufficiently specific); *Bentley v.*

*Comm'r of Soc. Sec.*, No. 1:13-CV-163, 2014 WL 906587, at \*12, 18 (N.D.W. Va. Mar. 7, 2014) (The ALJ's hypothetical, which stated that the person "would require a sit/stand option without breaking pace" and could "sit and stand for 20 minutes each at a time," was consistent with an at-will option and sufficiently specific); *Ruff v. Colvin*, No. 1:12-CV-165-RJC, 2013 WL 4487502, at \*7–8 (W.D.N.C. Aug. 20, 2013) (The ALJ's hypothetical included "sedentary work activity, but with a sit stand option," which was consistent with the option to sit/stand at-will and sufficiently specific); *Bailey v. Colvin*, No. 1:10-CV-626, 2013 WL 3864403, at \*10 (M.D.N.C. July 24, 2013), *report and recommendation adopted,* 2013 WL 5212825 (M.D.N.C. Sept. 16, 2013) (The ALJ "failed to specify in a hypothetical to the VE the frequency of alteration in the hypothetical sit/stand option," but the Court concluded "that it was implicit in the hypothetical that the claimant should be able to sit or stand at her own volition" and the "hypothetical to the VE was not so vague as to be fatally defective."); *Campbell v. Colvin*, No. 1:11CV327, 2014 WL 2815781, at \*4-5 (M.D.N.C. June 23, 2014) (The ALJ's hypothetical did not include a sit/stand option, but the vocational expert stated that the jobs offered a sit/stand option, which implied the claimant could sit/stand at will and satisfied the applicable law); *Scott v. Colvin*, No. 5:14-CV-291-RJ, 2015 WL 5607830, at \*4, 14 (E.D.N.C. Sept. 23, 2015) (The ALJ's hypothetical that included "a sit stand option, i.e., the individual would work in an occupation where he or she could sit and/or stand while performing the employer's tasks" was sufficiently specific); *Ayres v. Comm'r, Soc. Sec. Admin.*, No. CIV. SAG-14-2062, 2015 WL 1567777, at \*1 (D. Md. Apr. 7, 2015) (The ALJ's hypothetical that included a "sit/stand option" defined as jobs which "could be done in either the sitting or standing positions" satisfied the applicable law); *Carroll v. Colvin*, No. 3:15-CV-229-FDW, 2016 WL 3450831, at \*6–7

(W.D.N.C. June 21, 2016) (ALJ's hypothetical did not specify the frequency with which the claimant would be required to alternate between sitting and standing, but in such situations, it is implied that the option to sit/stand is at will); *Gelbrich v. Colvin*, No. 4:13CV54, 2014 WL 1891350, at *13 (The ALJ's hypothetical, which stated that the person could "sit four hours within an eight-hour workday with the option to sit or stand" satisfied the applicable standard.).

In this case, the ALJ questioned a vocational expert whether someone with Claimant's characteristics and capacity to perform less than sedentary work, including the ability to "stand two hours out of an eight-hour day for 30 minutes at a time" and "sit for six hours out of an eight-hour day for 30 minutes at a time," could perform any jobs in the national economy.   (Tr. at 72). The vocational expert provided several unskilled sedentary jobs that such individual could perform such as a document preparer, eyeglass polisher, and wire patcher. (*Id.*). The expert stated that routinely, in the jobs that she provided, it was not uncommon for a person to be able to stand up and stretch for a few minutes then sit back down and continue to perform the job duties. (Tr. at 74). The expert further testified that as the work is generally performed, there was "some flexibility position changing in the performance of sedentary work as defined by the DOT." (*Id.*).

Like the foregoing cases, the reasonable implication of the VE's testimony was consistent with an at-will sit/stand option and thus satisfied the applicable social security regulations and rulings. In fact, the vocational expert explicitly testified that the sedentary jobs that she provided accommodated Claimant's RFC and allowed the needed flexibility in changing positions. In accordance with SSR 83-12, due to the fact that Claimant had an "unusual limitation of ability to sit or stand," the ALJ consulted

a vocational expert regarding Claimant's limitations "to clarify the implications for the occupational base." Therefore, the ALJ complied with the applicable law in assessing the impact of Claimant's sitting and standing limitations on his ability to perform unskilled sedentary work.

Furthermore, there is no merit to Claimant's assertion that the vocational expert's testimony conflicted with SSRs 96-9p and 83-12 such that it rendered the ALJ's decision to rely on the testimony unsupported by substantial evidence. As the Fourth Circuit has stated, SSR 83-12, explicitly acknowledges that while a sit/stand option is not ordinarily available in unskilled jobs, there *are* unskilled light or sedentary jobs that allow sit/stand options. *Hyatt v. Apfel*, 153 F.3d 720 (4th Cir. 1998); *Walls v. Barnhart*, 296 F.3d 287, 291 (4th Cir. 2002). Therefore, the ruling "directs the agency to consult with a VE to assess the impact of that option on the occupation base." *Id.* "The Ruling does not prescribe a formula for assessing what jobs are available, and the VE's inclusion of sedentary jobs does not mean he disregarded SSR 83–12's recognition that a sit/stand option negatively impacts the number of unskilled jobs available." *Id.* In cases such as Claimant's, the ALJ is directed to consult a vocational expert, which is precisely what the ALJ did in this case. *See Buckner v. Colvin*, No. 1:10CV375, 2014 WL 3962463, at *5 (M.D.N.C. Aug. 13, 2014). The ALJ addressed all relevant limitations to allow meaningful review by this Court and the ALJ's analysis and decision is supported by substantial evidence.

Accordingly, the undersigned **FINDS** no error in the ALJ explanation of the RFC finding or in his acceptance of the VE's opinions regarding sedentary occupations allowing an at-will sit/stand option that could be performed by a hypothetical individual with Claimant's RFC.

23

**VIII.  <u>Recommendations for Disposition</u>**

Based on the foregoing, the undersigned United States Magistrate Judge respectfully **PROPOSES** that the presiding District Judge confirm and accept the findings herein and **RECOMMENDS** that the District Judge **DENY** Plaintiff's request for judgment on the pleadings, (ECF No. 10); **GRANT** the Commissioner's request for judgment on the pleadings, (ECF No. 13); **AFFIRM** the decision of the Commissioner; **DISMISS** this action, with prejudice, and remove it from the docket of the Court.

The parties are notified that this "Proposed Findings and Recommendations" is hereby **FILED**, and a copy will be submitted to the Honorable David A. Faber, United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and three days (if received by mail) from the date of filing this "Proposed Findings and Recommendations" within which to file with the Clerk of this Court, specific written objections, identifying the portions of the "Proposed Findings and Recommendations" to which objection is made, and the basis of such objection. Extension of this time period may be granted by the presiding District Judge for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. *Thomas v. Arn*, 474 U.S. 140 (1985); *Snyder v. Ridenour*, 889 F.2d 1363 (4th Cir. 1989); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984). Copies of such objections shall be provided to the opposing party, Judge Faber, and Magistrate Judge Eifert.

24

The Clerk is directed to file this "Proposed Findings and Recommendations" and to provide a copy of the same to counsel of record.

**FILED**:  June 18, 2018

Cheryl A. Eifert
United States Magistrate Judge